**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| | : | |
| MINISTER TRUTH ALI EX REL | | Civil Action No. 12-2797 (RBK) |
| "FORMERLY KNOWN AS | : | |
| STEPHAN WILLIAMS," | | |
| | : | |
| Plaintiff, | | |
| | : | |
| v. | | |
| | : | **MEMORANDUM OPINION** |
| THE STATE OF NEW JERSEY | | **AND ORDER** |
| "MUNICIPAL COURT OF CAMDEN A | : | |
| NONPROFIT CORPORATION | | |
| OPERATING WITHIN THE | : | |
| JURISDICTION OF (NEW JERSEY | | |
| REPUBLIC)" et al., | : | |
| | | |
| Defendants. | : | |

This matter comes before the Court upon the Clerk's receipt of a set of documents titled "Motion for Removal based on Lack of Evidence of a Crime & Conflict of Interest with offer of proof by Affidavit & Notice of Minister Truth Ali International Indigenous Society Cherokee Choctaw Aboriginal Nation," see Docket Entry No. 1(capitalization and lack thereof, as well as symbols, in original) (hereinafter "Submission"); that Submission arrived accompanied by an application to proceed in this matter in forma pauperis, see Docket Entry No. 1-1 (informing this Court that the filer of the application is homeless and without income but, nonetheless, maintains $270 of monthly expenses covered, apparently, from an unidentifiable source), and it appearing that:

1.      The Submission, executed by a person seemingly referring to himself as "Minister Truth

        Ali" and whose official name appears to be "Stephan Williams" (hereinafter "Plaintiff"),

        is drafted in the style indicating that the drafter is affected by or shares in "Moorish,"

        "Marrakush," "Murakush" or akin perceptions, which often coincide with

        "redempotionist" and/or "sovereign citizen" socio-political beliefs.  See Bey v. Stumpf,

        2011 U.S. Dist. LEXIS 120076, at *2-13 (D.N.J. Oct. 17, 2011) (detailing various aspects

        of said position).

2.      While the exact gist of the Submission cannot be established with a degree of certainty

        allowing for screening, moreover adjudication, of Plaintiff's claims, this Court – upon

        carefully studying the Submission – cannot rule out the possibility that the factual

        predicate Plaintiff was aiming to assert was as follows:

        a.      At a certain point in time during early April 2012 or prior, Plaintiff was seemingly

                charged, in the state court, with certain offenses.  By April 12, 2012, Plaintiff's

                aforesaid proceedings were underway in Camden City Municipal Court, and

                Plaintiff – being named as the defendant in those proceedings – was present in the

                courtroom before, seemingly, Chief Judge Steven P. Burkett ("Judge Burkett").

                The daily calendar of the matters to be heard by Judge Burkett was announced,

                and Plaintiff was displeased to learn that his matter was scheduled to be heard the

                last.  Plaintiff, therefore, informed Judge Burkett of his displeasure and either

                asked for an adjournment or simply declared his desire to leave the courtroom for

                the purposes of attending Plaintiff's "personal & important business matters."

      b.     Upon being directed by Judge Burkett to take his seat and wait until his matter is heard, Plaintiff informed Judge Burkett of Plaintiff's opinion that the state court lacked subject matter jurisdiction over Plaintiff and that Plaintiff self-declared himself "not a United States citizen."  On the grounds of the same, Plaintiff informed Judge Burkett of Plaintiff's position that he was not subject to the powers of state judiciary and/or state administrative entities.  Having made these announcements, Plaintiff apparently attempted to leave Judge Burkett's courtroom, in outright contempt of Judge Burkett's order.

      c.     Plaintiff's contemptuous conduct resulted in Plaintiff's arrest executed shortly thereafter, right in the state courthouse premises (which arrest Plaintiff, seemingly, attempted to avoid by still trying to leave the courthouse), Plaintiff's search incident to sais arrest (to which search Plaintiff, apparently, vigorously objected restating his jurisdictional position to law enforcement officers) and Plaintiff's brief placement in custody.

      d.     The above-detailed events, seemingly, resulted in two misdemeanor charges against Plaintiff, mounted in addition to the offense underlying Plaintiff's original state proceedings.

See, generally, Docket Entry No. 1, at 5-6 (also suggesting that Plaintiff attempted to present law enforcement officers with his home-made "Marrakush" credentials).

3.     Plaintiff's Submission, seemingly: (a) seeks either removal of Plaintiff's criminal proceedings to this District or this Court's order directing Judge Burkett to recuse himself from presiding over Plaintiff's state proceedings; and, in addition, (b) strives to mount

civil challenges against the law enforcement officers who executed Plaintiff's arrest and search incident to that arrest.  See id. at 12.

4.     The Submission at bar, while loosely hinting at the above-detailed allegations and claims, states these allegations in obscure, often nearly incomprehensible "Marrakush" argot and, in addition, asserting a slew of facially deficient "Marrakush"-type rights.  See, generally, Docket Entry No. 1.  In light of the foregoing, the Court will dismiss the Submission without prejudice to Plaintiff's filing of a cognizable pleading, executed pursuant to the requirements posed by Rule 8 of the Federal Rules of Civil Procedure.[1]  In conjunction with that directive, the Court finds it warranted to highlight to Plaintiff facial invalidity of any "Marrakush"-style submission.

> Moorish and Redemptionist Movements.  Two concepts, which may or may not operate as interrelated, color the issues at hand. One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces these individuals' denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."

---

[1]  A civil complaint must conform to the requirements set forth in Rules 8(a) and (e).  The Rules require that the complaint be simple, concise, direct and set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993); cf. McNeil v. United States, 508 U.S. 106, 113 (1993) (procedural rules in civil litigation should not be interpreted so as to excuse mistakes by those who proceed without counsel); Burks v. City of Philadelphia, 904 F. Supp. 421, 424 (E.D. Pa. 1995) (pleading which represented a "gross departure from the letter and the spirit of Rule 8(a)(2)" in failing to contain a short and plain statement of claims struck by District Court); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (affirming dismissal of pro se civil rights complaint naming numerous defendants, setting forth numerous causes of action, and numbering fifteen pages and eighty-eight paragraphs). "A District courts should not have to read and decipher tomes disguised as pleadings."  Lindell v. Houser, 442 F.3d 1033, 1035 n.1 (7th Cir. 2006).

[a].    Moorish Movement

In 1998, the United States Court of Appeals for the Seventh Circuit - being one of the first courts to detail the concept of Moorish movement, observed as follows:

> [The Moorish Science Temple of America is a] black Islamic sect .
> . . . [T]hree-fourths of its temples (congregations) are inside prisons.  The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . .  Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

Johnson-Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[2]

[b].    "Redemptionism," "Paper Terrorism" and Related Concepts

Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s.  Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

---

[2]  The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent."  Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

Sovereign Citizen Movement, Anti-Defamation League, at <<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extremism&LEARN_SubC at=Extremism_in_America&xpicked=4&item=sov>> (visited on Mar. 31, 2011).[3]  Consequently, a decade after the Seventh Circuit's issuance of Bey v. Lane, the United States Court of Appeals for the Third Circuit noted a stream of government actions aimed at controlling the "paper terrorism" activities of sovereign citizens, which - by then - matured into a wide-spread criminal scheme, where the scheme participants' "self-legitimized" their names for the purposes of initiating fraudulent legal transactions.  The Court of Appeals explained:

> Evidently, [adherents of this scheme have been] filing [fraudulent] financing statements under Article 9 of the UCC, which sets forth a process for perfecting security

---

[3]  The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of "world passports."  "World passports," issued by the so-called World Service Authority ("WSA"), are not recognized, in the United States and in the majority of world nations, as substitutes to official documents, such as national passports or drivers' licenses.  See, e.g., Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36 (1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/07m1310.pdf>>.  A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing the United Nations to argue that world peace requires a global government rather than a system of nation-states.  See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006).  The WSA has been promoting "world citizenship" by issuing documents largely similar in their appearance to regular national passports, which the WSA called "world passports," to any person who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain such "passport" by filling out an application form at the WSA website.  See <<http://www.world government.org/>>.  Therefore, while some persons just denounce their United States citizenship under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. 2011), others accompany their denouncements of United States citizenship by applications for "world passports" and attempts to use these passports as legally cognizable documents, sometimes for the purposes of perpetrating criminal schemes in the United States.  See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App. 1998).  Moreover, a person's denouncement of his/her United States citizenship (being occasionally accompanied by the person's obtaining of a "world passport") frequently produces a peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid the reach of law.  See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan. Nov. 4, 2009).

interests in property.  These liens and judgments, accessible on financing statement forms, are easy to file. Once registered, however, the fraudulent liens are very burdensome to remove. For example, in a New Jersey incident, [one group] registered a fraudulent $ 14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using [the group participants'] "copyrighted" names in court papers and hearings . . . .  [Adherents of this scheme] have filed these commercial liens with state departments of revenue, departments of state, or other state agencies responsible for receiving and recording these financial instruments. Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms.  [These publications built on] the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman."  . . .  Redemptionists claim that government has power only over the strawman and not over the live person, who remains free [and, thus,] individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, [pursuant to this "theory,"] the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody.  If government officials refuse, [adherents of this scheme] file liens against [government officials] . Adherents of this scheme also advocate that [they] copyright their names to justify filing liens against officials using their names in public records such as indictments or court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008); accord Roche, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 2 (noting that the "sovereign citizen" litigant elected to present the district court's dismissal of his petition as a "contract" between the court and the litigant).

The "strawman" concept is, occasionally, presented/exploited somewhat differently by those redemptionists who claim that - at the moment of their denouncement of United States citizenship and/or their accompanying

self-grant of imaginary alternative citizenship - their "strawman" incarnation became "deceased," and their live persons quasi-expatriated from the U.S. (while continuing their actual physical residence in the United States).  In connection with this odd quasi-expatriation scheme, such redemptionists often claim that their live persons: (a) hold "estates" in the form of actual physical bodies of their respective  "quasi-deceased" strawmen;[4] and (b) reside in geographic locales "self-claimed away" from the United States.

[c].     Interplay Between Moorish and Sovereign Citizenship Movements

It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the

---

[4]  This "estate" concept is legally deficient on its face. As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574, 211 S.E.2d 879 (1975) (clarifying that the estate is limited to the real and personal property of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864, 677 N.E.2d 33, 222 Ill. Dec. 220 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317, 352 A.2d 334 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

law, bases, which these individuals keep creating in order to support their allegations of "diplomatic immunity."[5]

Murakush-Amexem, 790 F. Supp. 2d 241, 2452-12 (footnotes in original).

5.    Therefore, Plaintiff's amended pleading, if submitted, must be executed without any resort to "Marrakush" argot and without any assertions of Plaintiff's "immunity from suit," "Marrakush" rights, him being a fictitious "Marrakush" entity in possession of his body, etc.

6.    In addition, taking notice of what appears to be Plaintiff's interest in asserting Fourth Amendment challenges, this Court finds it warranted to detail to Plaintiff's relevant legal principles, which the Court urges Plaintiff to examine with great care prior to execution of his amended pleading.

a.    The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon

---

[5] Such claims of "diplomatic immunity" are without merit. As it was already observed,

[Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings.  See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

> probable cause, supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons or things to be
> seized.

U.S. Const., Amend. IV.  The provisions of the Fourth Amendment are applicable

to the States by virtue of the Fourteenth Amendment's Due Process Clause.  See

Cady v. Dombrowski, 413 U.S. 433, 440 (1973).  The Fourth Amendment permits

an arrest to be made only on the basis of "probable cause."  Papachristou v. City

of Jacksonville, 405 U.S. 156, 169 (1972).

> Probable cause "requires more than mere suspicion[.]"  Orsatti[ v.
> New                         Jersey State Police], 71 F.3d [480,] 482 [ (3d
> Cir. 1995)].  However, it does not "require the same type of
> specific evidence of each element of the offense as would be
> needed to support a conviction."  Adams v. Williams, 407 U.S.
> 143, 149 (1972).  Rather, "probable cause to arrest exists when the
> facts and circumstances within the arresting officer's knowledge
> are sufficient in themselves to warrant a reasonable person to
> believe that an offense has been or is being committed by the
> person to be arrested."  Orsatti, 71 F.3d at 483; see also Wilson v.
> Russo, 212 F.3d 781, 789 (3d Cir.2000) ("Probable cause exists if
> there is a 'fair probability' that the person committed the crime at
> issue." (citation omitted)).  "Probable cause need only exist as to
> [one of the] offense[s] that could be charged under the
> circumstances."  Barna v. City of Perth Amboy, 42 F.3d 809, 819
> (3d Cir.1994).  In analyzing whether probable cause existed for an
> arrest, we must take a "totality-of-the-circumstances approach."
> Illinois v. Gates, 462 U.S. 213, 230 (1983).

Reedy v. Evanson, 615 F. 3d 197, 211 (3d Cir. 2010).  Thus, in determining

whether probable cause existed for an arrest, the court applies an objective

standard based on "'the facts available to the officers at the moment of arrest.'"

Barna, 42 F.3d 819 (quoting Beck v. Ohio, 379 U.S. 89, 96 (1964)); see also

Edwards v. City of Phila., 860 F.2d 568, 571 n. 2 (3d Cir. 1988)).  Moreover,

'[e]vidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law." Id. (citing Henry v. United States, 361 U.S. 98, 102 (1959)); see also Virginia v. Moore, 553 U.S. 164, 171 (2008) ("[w]hen an officer has probable cause to believe a person committed even a minor crime . . . the balancing of private and public interests is not in doubt [and t]he arrest is constitutionally reasonable"). "To find that there was an unlawful arrest in violation of the Fourth Amendment, [it needs to be shown] that, under the facts and circumstances within [the officer's] knowledge, a reasonable officer could not have believed that an offense had been or was being committed by the person to be arrested."[6] Mosley v. Wilson, 102 F.3d 85, 94-95 (3d Cir. 1996); accord Revell v. Port Authority of New York, New Jersey, 598 F. 3d 128, 137 n.16 (3d Cir. 2010). Moreover, "[p]robable cause [does not require] a showing that the officer's belief is more likely true than false." Hughes v. Meyer, 880 F. 2d 967, 969 (7th Cir. 1989). An arrest is deemed constitutional where a reasonable officer could have believed that a criminal offense had been or was being committed. See Mosley, 102 F.3d at 94-95. Moreover, a judicial contempt order may supply sufficient probable cause for arrest of the person acting in contempt. See, e.g., Levine v. Lawrence, 2005 U.S. Dist. LEXIS 11663 (E.D.N.Y. June 15, 2005) (dismissing challenges to constitutionality of the statutory scheme allowing for arrest pursuant to a contempt order); accord In re

---

[6] The Fourth Amendment does not require the issuance of an arrest warrant prior to arrest (or imprisonment pursuant to that arrest). Cf. Albright v. Oliver, 510 U.S. 266, 274-75 (1994).

Bustos, 2009 U.S. Dist. LEXIS 79091 (W.D. Tex. Sept. 1, 2009); Slutzky v. Auto.

Parts Express Warehouse, Inc., 2009 U.S. Dist. LEXIS 81637 (S.D. Fla. Aug. 21,

2009); United States v. Thompson, 2004 U.S. Dist. LEXIS 21195, 94 A.F.T.R.2d

(RIA) 6385 (E.D. Cal. 2004); Chadwick v. Delaware County Court of Common

Pleas, 1995 U.S. Dist. LEXIS 5130 (E.D. Pa. Apr. 13, 1995) (treating a judicial

order of contempt as a bench warrant).

b.     The Fourth Amendment protects against unreasonable searches as well as

unreasonable seizures.  An officer must have probable cause to perform a lawful

warrantless search of a car.  See California v. Acevedo, 500 U.S. 565, 569-70

(1991).  Probable cause to conduct a search exists "where the known facts and

circumstances are sufficient to warrant a man of reasonable prudence in the belief

that contraband or evidence of a crime will be found."  Ornelas v. United States,

517 U.S. 690, 696 (1996) (citing Brinegar v. United States, 338 U.S. 160, 175-76

(1949), and Illinois v. Gates, 462 U.S. 213, 238 (1983)).  In addition, a search

conducted outside the context of any detention/correctional facility might also be

valid if its is "incident to arrest."  Cf. Arizona v. Gant, 556 U.S. 332 (2009).

Finally, any detainee or inmate's entry into a correctional/detention facility is

might be validly accompanied by a search.  See Florence v. Bd. of Chosen

Freeholders, 132 S. Ct. 1510 (2012).

7.     Here, Plaintiff's Submission suggests that Plaintiff was duly arrested on the basis of

Judge Burkett's contempt order, and his search was conducted incident to that arrest or in

connection with Plaintiff's being processed into a detention facility.  However, as noted

<u>supra</u>, the Court's understanding of Plaintiff's claims is obstructed by Plaintiff's resort to

"Marrakush" argot and assertions of "Marrakush"-type claims.

IT IS, THEREFORE, on this __15th__ day of ___October___ , 2012,

ORDERED that the submission docketed as Docket Entry No. 1 is dismissed.  Such

dismissal is without prejudice to Plaintiff's filing of a civil complaint (or a proper notice of

removal), provided that such filing is executed in accordance with the requirements of Rule 8, in

plain English, as detailed herein, without any resort to "Marrakush" argot, and without references

to "Marrakush"-type rights or assertions of "Marrakush"-type claims; and it is further

ORDERED that, in the event Plaintiff elects to file a duly executed complaint or notice of

removal, Plaintiff must include in said filing a written statement harmonizing Plaintiff's

averment that he has no source of income of any kind with Plaintiff's assertion that he has been

bearing $270 monthly expenditures every month; and it is further

ORDERED that the Clerk shall administratively terminate this matter by making a new

and separate entry on the docket reading "CIVIL CASE TERMINATED"; and it is further

ORDERED that administrative termination is not a dismissal on merits, and Plaintiff may

have this matter reopened in the event he submits, within sixty days from the date of entry of this

Memorandum Opinion and Order, his duly executed civil complaint (or his notice of removal),

accompanied by his written statement harmonizing his expenditures and lack of income; and it is

further

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon the

addressee designated in the submissions made in the above-captioned matter; and it is finally

ORDERED that the Clerk shall include in the said mailing a blank civil complaint form

and a blank <u>in forma pauperis</u> application.


s/Robert B. Kugler
**Robert B. Kugler**
**United States District Judge**